1          IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF NORTH CAROLINA

3
    UNITED STATES OF AMERICA     )
4                                )  Case No. 1:10CR71-1
        vs.                      )
5                                )  Greensboro, North Carolina
    DARIUS TREMAYNE BROOKS,      )
6                                )  January 19, 2011
                                 )
7                                )  9:47 a.m.
        Defendant.               )
8    _____)

9
                     TRANSCRIPT OF SENTENCE
10
          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
11
                  UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   For the Government:   SANDRA HAIRSTON, AUSA
                           Office of the U.S. Attorney
15                         101 S. Edgeworth Street, 4th Floor
                           Greensboro, North Carolina 27401
16

17
     For the Defendant:   JOHN A. DUSENBURY, AFPD
18                         Office of the Federal Public Defender
                           301 N. Elm Street, Suite 410
19                         Greensboro, North Carolina 27401

20

21   Court Reporter:      Joseph B. Armstrong, RMR, FCRR
                           324 W. Market, Room 101
22                         Greensboro, NC  27401

23

24           Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25

                US v. Brooks - Sentence - January 19, 2011

1          Greensboro, North Carolina

2          January 19, 2011

3          (At 9:47 a.m., proceedings commenced.)

4          THE COURT:  All right.  Ms. Hairston?

5          MS. HAIRSTON:  Yes, Your Honor, good morning.

6   Your Honor, the next case will be the United States of

7   America versus Darius Tremayne Brooks, Case No. 1:10CR71-1.

8   Mr. Brooks is represented by John Dusenbury.  The case is

9   called for sentencing.

10          THE COURT:  Good morning, Mr. Dusenbury.

11          MR. DUSENBURY:  Good morning, Your Honor.

12          THE COURT:  Are you and Mr. Brooks ready to

13   proceed with this hearing?

14          MR. DUSENBURY:  We are.

15          THE COURT:  Have you received a copy of the

16   presentence report and reviewed it with Mr. Brooks?

17          MR. DUSENBURY:  Yes, I have, Your Honor.

18          THE COURT:  Are there any objections?

19          MR. DUSENBURY:  Your Honor, we don't have any

20   unresolved objections.  However, there is just one minor

21   factual correction that really doesn't have a direct bearing

22   on the guidelines that Mr. Brooks asked me to bring to the

23   Court's attention.

24          It is in paragraph 36, probably the third from the

25   last sentence says, "The defendant provides no support and

US v. Brooks - Sentence - January 19, 2011

has no type of relationship with his son."  He asked me to
inform the Court that he indeed does have a relationship
with that child.  In fact, when he was -- Mr. Brooks --
before he was incarcerated, he regularly kept his son on
weekends.  It's true he was not paying child support as
such, but he was -- he does have a relationship with his
son.  That is a factor that I envisioned as having some
significance under the 3553 factors.

          THE COURT:  All right.  Ms. Hairston, any
objection to me considering that?

          MS. HAIRSTON:  No, Your Honor.

          THE COURT:  All right.  I'll take that -- I'll
note that, Mr. Dusenbury.  Any further matters in relation
to the presentence report?

          MR. DUSENBURY:  No, sir.

          THE COURT:  All right.  Mr. Brooks, do you agree
with Mr. Dusenbury; that is, first of all, you have reviewed
the presentence report, is that correct?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  And do you agree that with that one
relatively minor change, there are no objections, is that
correct?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  All right.  You may have a seat,
Mr. Brooks.

US v. Brooks - Sentence - January 19, 2011

1    I will find in Mr. Brooks' case that -- I will

2  adopt the presentence investigation report without change.

3  Mr. Brooks' offense of conviction, that is, the 922(g)

4  offense, does not carry a mandatory minimum sentence.  The

5  resulting advisory guideline calculation is as follows:

6         A total offense level of 25.

7         A criminal history category of IV.

8         A guideline imprisonment range of 84 to 105

9  months.

10         A supervised release range of two to three years.

11         A fine range of 10,000 to $100,000.

12         A special assessment of $100 is mandatory.

13       Mr. Dusenbury, will there be any additional

14  evidence on behalf of Mr. Brooks?

15       MR. DUSENBURY:  No evidence, Your Honor.

16       THE COURT:  Then I will hear from you at this time

17  as to what constitutes a sentence that is sufficient but not

18  greater than necessary taking into consideration the

19  advisory guideline calculation as well as all other factors

20  set forth under 18 USC Section 3553.

21       MR. DUSENBURY:  Thank you, Your Honor.  At the

22  outset, I would like to point out, Your Honor, that

23  Mr. Brooks' grandmother and his cousin are also present

24  today.

25       THE COURT:  Thank you both for taking the time to

US v. Brooks - Sentence - January 19, 2011

1    come here today.

2              MR. DUSENBURY:  Your Honor, I certainly have some

3    very specific points I would like to make, but I'm thinking

4    that the Court may well have specific questions or concerns

5    that maybe my remarks might not get to as readily as could

6    be accomplished.  If there were particular things --

7              THE COURT:  I'll ask them as you go along,

8    Mr. Dusenbury.

9              MR. DUSENBURY:  All right, sir.  Your Honor,

10   having in mind the mandate of 3553 -- and I was thinking

11   specifically about the notion -- the concept of sufficiency,

12   sufficiency of the sentence without being excessive.

13             It seems to me that whole idea of sufficiency is

14   informed largely by perspective, and just no matter how

15   accurate a presentence report is, the limitations of time,

16   space, and investigative resources just limit the

17   perspective, and I think that's particularly true with

18   Mr. Brooks' case for this reason.  Simply, reading the

19   presentence report in its entirety, offense conduct and

20   historical information taken together, one could easily come

21   away with the conclusion that this was nothing more than a

22   premeditated armed robbery of Mr. Brooks's cousin and her

23   boyfriend for --

24             THE COURT:  I would say that more likely

25   premeditated armed robbery of the boyfriend, and the cousin

US v. Brooks - Sentence - January 19, 2011

happened to show up.

MR. DUSENBURY: Yes, sir. Well, that's what the Court -- that was one of the points that I wanted to make.

Your Honor, but even more than that I think is this -- and that is accurate as far as it goes. My contention is it just doesn't go far enough, because some of the most -- the facts that lend the greatest perspective are the facts that may lie between the facts set forth in the report.

For example, one is the relationship between Mr. Brooks -- of what the relationship was at the time of the offense between Mr. Brooks and Mr. Taylor, his codefendant. Mr. Brooks, who is now 21 years old, was 19 at the time. Mr. Taylor was at that time was around 23, or early twenties, 22, 23, 24, somewhere around there. Taylor had by that time become something of a street mentor to Mr. Brooks, a mentorship that, you know, is very easily understood in retrospect because Mr. Brooks, at age 10 -- in that year he lost both his mother, who, despite her problems with substances, loved him dearly. And I guess as he looks back on it, he realizes she may be one of the few people that he's come in contact with in his life who actually loved him unconditionally, despite her problems. And he also lost his father who was sent to federal prison when he was 10 years old.

US v. Brooks - Sentence - January 19, 2011

1        And from that time until now, he actually has been
2   bounced around from household to household.  And it's
3   fortunate that he had relatives who were willing to take him
4   in; but he pointed out to me that, you know, even if you're
5   in the household of an uncle or an aunt and their cousins --
6   you're surrounded by cousins who are more or less your same
7   age, that you are -- there is -- there is still a palpable
8   void.  I mean, you're still an outsider, notwithstanding the
9   best intentions.  I'm sure we all know that children can be
10  fairly cruel to each other, and those things had an impact
11  on him.

12        Now, I'm talking about -- I've alluded to
13  Mr. Taylor's mentorship.  Well, it's not like that was a
14  mentorship that was imposed on Mr. Brooks.  Mr. Brooks chose
15  that mentor.  But that was a choice made at 16, 17, 18 years
16  old after really not having had the -- a man in his life to
17  mentor him or instruct him or guide him or provide an
18  example of what manhood looks like when directed along the
19  proper path.

20        As the presentence report reflects, his father,
21  who apparently the mentorship offered while Mr. Brooks's
22  mother and father were in the same household had to do --
23  was mostly drug abuse and violence.  That was what he was --
24  that was what was implanted in his subconscious as a young
25  boy.  And so that --

US v. Brooks - Sentence - January 19, 2011

1          THE COURT:  I meant to ask you.  In paragraph 35,

2    according to the defendant's father in his presentence

3    report, Valencia Brooks was addicted to cocaine base and

4    died of an aneurysm in July of 2000.  The defendant

5    described his relationship with Ms. Brooks as one centered

6    around smoking crack and violence, but she -- does that mean

7    he, that is, your client, the defendant, was the one saying

8    that his relationship was centered around smoking crack and

9    violence or the defendant's father?

10          MR. DUSENBURY:  I took it to mean the latter, Your

11   Honor.

12          PROBATION AGENT:  I can clarify that, Your Honor.

13   I caught that this morning.  That was Mr. Perkins'

14   statement.

15          THE COURT:  Okay.  So it's the -- okay.  Thank

16   you.  I caught that the first time.  Something you said

17   reminded me I wasn't sure about that.  All right.  You may

18   go ahead.

19          MR. DUSENBURY:  So -- and I was just alluding,

20   Your Honor, to what I think are some significant historical

21   facts that led to Mr. Brooks being where he was on this day.

22          Another fact that I think is relative to the

23   perspective that we're talking about, Your Honor, is not

24   that it -- it certainly doesn't excuse the crime, it may not

25   even mitigate the crime significantly, but that is the fact

US v. Brooks - Sentence - January 19, 2011

1    that Mr. Shuff -- who, by the way, is now deceased, he was

2    killed -- was at that time a drug dealer.  Mr. Brooks

3    obviously knew that his cousin dated Shuff, but another one

4    of these facts that I'm alluding to, Your Honor, is actually

5    something that Mr. Brooks just recently shared with me.  I

6    didn't know this at the time of change of plea.

7            But as -- and that was a conversation between

8    himself and Taylor just before the robbery occurred, because

9    Mr. Brooks knew that his cousin lived at this residence.

10   And he told Taylor, look, if my cousin's there, I'm not

11   going through with this.  He at least appreciated the

12   possibility that what they were about to do could have some

13   terrible negative ramifications for his cousin whom he loved

14   very, very much.  And when -- after staking the place out

15   for about 20 minutes or so, they realized that the cousin

16   was not at home, which she later confirmed in her statement

17   to police.  She and her mother had been to Wal-Mart.  In

18   fact, the cousin reported --

19           THE COURT:  What do you think -- what do you think

20   then contributes to the decision, the conscious decision, of

21   if my cousin is here, I'm not going to participate in the

22   robbery.  Then when the cousin shows up, instead of running,

23   instead of leaving, they put a gun to the cousin -- one puts

24   a gun to the cousin's head.

25           MR. DUSENBURY:  Yes, sir.

US v. Brooks - Sentence - January 19, 2011

1    THE COURT:  And then one or both tie the cousin up
2  and put her in the closet.
3    MR. DUSENBURY:  Yes, sir.
4    THE COURT:  How do we go from "If she's there,
5  we're not going to do this," to, "Well, now she's here,
6  let's tie her up, and put her in the closet."
7    MR. DUSENBURY:  I think it's panic.  I think --
8    THE COURT:  Why would you panic that way instead
9  of running?
10    MR. DUSENBURY:  And, Judge, of course, that is the
11  question, and that question is unanswerable, I would
12  contend.  You know, because there's so many of the
13  unfortunate choices that probably all of us have made in our
14  life that looking back on we ask that same question: why did
15  I do this rather than do that?  Fortunately --
16    THE COURT:  We definitely -- everybody in this
17  courtroom, I'm sure, asks that question about a number of
18  decisions they've made.
19    MR. DUSENBURY:  Yes, sir.
20    THE COURT:  But I doubt -- I don't -- nobody's
21  made a decision like this.  Let me put it in perspective.
22    As I listened to you talk, Mr. Dusenbury, I was
23  thinking about an article I read a while back and -- the
24  crime that I was reading about has got nothing to do with
25  this case.  But it was in a terrorism case, and there was

1   apparently some indication that the defendant was going to

2   claim the defense of entrapment which would then lead to

3   whether or not the Government could prove that the defendant

4   was predisposed to it.  It was all speculative.

5           But the writer of this article raised a point,

6   which is, how do you -- what normal American citizen would

7   you ever believe was predisposed to commit a terrorist act

8   or not commit a terrorist act?  In other words, what they

9   were saying was nobody that we know of normal in society

10  walks around thinking about or is predisposed toward

11  committing a terrorist act.  It just goes beyond the pale.

12  Do you understand what I'm saying so far --

13          MR. DUSENBURY:  I think so.

14          THE COURT:  -- or follow what I'm saying so far?

15  And to a certain degree, sometimes I look at these

16  robberies, and I can't understand how they progress in the

17  manner which they do.

18          Now, even without your comments, it is clear -- I

19  mean, in paragraph 7, "While she was in the closet, she

20  heard a man come to the closet door several times and say,

21  Renee, I love you, and I love Kwami.  Renee Martin

22  recognized the voice as belonging to Damian Levonne Taylor."

23          And so you look at -- I look at this situation,

24  and it really defies explanation to tie somebody up, put

25  them in the closet, kidnap them, do all these things to them

1   at gunpoint and then turn around and make these comments

2   that, it seems to me, clearly are going to disclose who you

3   are; and, second, just are completely -- I don't know any

4   other way to say it other than just crazy in the middle of a

5   robbery.  It just doesn't make any sense at all.

6        But it's not my duty to understand it.  One of my

7   responsibilities is to decide what sentence is sufficient

8   but not greater than necessary to protect the public from

9   further crimes of the defendant.  So when I'm confronted

10  with an offense like this, even if I look at it and say the

11  defendant had no structure, no advantage, no family

12  structure, just really nothing during the course of their

13  childhood, and that makes the crime at least in some

14  respects understandable, no structure, this is where

15  Mr. Brooks ended up.  But on the other hand, I've got to

16  decide what's necessary to make sure that Mr. Brooks doesn't

17  do this again.

18       So how do I lay a logic yard stick against this

19  type of conduct and say, oh, well, 84 months is enough or

20  105 months is enough or 120 months is enough, if part of my

21  responsibilities is to protect the public no matter how

22  understandable the end result of Mr. Brooks' commission of

23  this offense may be?

24       MR. DUSENBURY:  Well, Your Honor, I would say

25  this.  First, I think that perhaps we may look amiss if we

US v. Brooks - Sentence - January 19, 2011

 1   look for logic where it really doesn't exist, because I

 2   agree with the Court, there is no logical explanation to the

 3   conduct -- the contradictory conduct that we're talking

 4   about.  But I disagree with the Court in terms of a duty to

 5   understand, because I think it's -- I think it is -- it's

 6   not logical, but it is understandable.  I think --

 7           THE COURT:  Well, let me back up.  I admit I see a

 8   lot of things that I realize I will never understand, and I

 9   accept that.  But I do have a responsibility to come to some

10   understanding of what sentence is sufficient but not greater

11   than necessary to achieve these factors set out under 3553,

12   one of which is to protect the public from further crimes of

13   the defendant and to provide adequate deterrence --

14           MR. DUSENBURY:  Absolutely.

15           THE COURT:  -- to criminal conduct, two of which

16   are.  So how do I take that kind of logical factor or those

17   rational factors and apply them to something like this in

18   this case?

19           MR. DUSENBURY:  Your Honor, I think we do that or

20   at least we approach that by trying to glean -- since one of

21   the other factors that the Court has to weigh in fashioning

22   the sentence is the history of the defendant -- trying to

23   glean to the extent that week, and even though, granted --

24           THE COURT:  Does his history suggest a lesser

25   sentence or a greater sentence?

 1          MR. DUSENBURY:  Well, for the reasons that I'm

 2     probably not doing a good job of articulating, I think a

 3     lower sentence for this reason.  Because I think there is a

 4     duty to at least attempt to understand what was going

 5     through his mind at the time, even as it relates to this

 6     conduct that is inexplicable logically, because that, more

 7     than anything else -- more than the result of this crime,

 8     the thing that informs the extent to which the public needs

 9     to be protected from this man is what's going on inside him.

10     And, granted, I mean, none of us can know that, but I think

11     there are clues that suggest why he did the thing that

12     caused him to be here today.  And maybe even -- certainly

13     imperfectly, and probably more imperfectly what he's likely

14     to do in the future.  But as imperfect as those indicators

15     are, I think we still have a duty to at least look at them.

16          And going back to the Court's original point about

17     the article that you read about the terrorist.  The parallel

18     I see here, Your Honor, is that one person's terrorism is

19     another person's heroism.  Nobody sets out to be a

20     terrorist, but a number of people set out to be heroes; and

21     because of some warped thinking, they come to a place where

22     they perceive the conduct that normal people would regard as

23     antisocial as heroic.  That, I think, is the explanation.

24          Your Honor, for whatever reason I'm reminded of a

25     scene in the movie Training Day.  Did the Court happen to

Case 1:10-cr-00071-WO   Document 26   Filed 04/09/11   Page 14 of 38

1   see that movie?

2           THE COURT:  Many times.

3           MR. DUSENBURY:  All right.  Well, it's the scene

4   where Denzel Washington's partner is abandoned in the

5   apartment of these Hispanic drug dealers who are about to

6   kill him.  At the end of that scene when the leader of that

7   group discovers that this guy had been instrumental in

8   helping his young cousin, and they're about to let him go,

9   he says, look, it was nothing personal.  You know, I was

10  about to blow your head off with a shotgun in the bathtub,

11  but it was nothing personal.  Now, none of us can really get

12  our minds around that kind of thinking, but that is the

13  kind -- they regarded murder as just business.  It's nothing

14  personal, it's just business.

15          It's something on -- something like that kind of

16  thinking, I think, Your Honor, is common.  Not uncommon.

17  It's common to people who think that it's a good idea to rob

18  any -- another person, whether it's a drug dealer or not.

19  They come to a place -- nobody starts off thinking that way,

20  but as a result of experiences and influences and examples

21  and decisions.  It's not just stuff that happens to us, it's

22  stuff that we decide -- the way we decide to deal with stuff

23  that happens to us.  We know people have come through

24  situations like what Mr. Brooks has experienced and make

25  totally different choices.  We know that.

Case 1:10-cr-00071-WO   Document 26   Filed 04/09/11   Page 15 of 38

1          But I think it's a function of -- it's a function

2    of, again, the term the totality of the circumstances or

3    really the totality of the influences that inform the

4    choices that cause someone to think that, okay, this isn't

5    personal.  I'm robbing this guy for business reasons, but at

6    least I'm being principled enough to say that if my cousin

7    is there, I'm not going through with it.  And then to be

8    surprised by the cousin, to act in the way they acted, I

9    think, is -- the only explanation is panic.

10         THE COURT:  Okay.  And if I accept all that and

11   the reasons that Mr. Brooks got to where he was, then tell

12   me what I should do in terms of a sentence when someone has

13   gotten to the point where they can make the business

14   decision that Mr. Brooks and his partner made in committing

15   this robbery.  Does that mean a lower sentence is enough?

16   Does that mean higher?  What --

17         MR. DUSENBURY:  Yes, sir.

18         THE COURT:  Within the parameters of 922(g), what

19   do you think I should do?

20         MR. DUSENBURY:  I think a sentence of seven years,

21   which is about -- no, it's exactly one-third of the -- of

22   his life to date, which happens to be the low end of the

23   guideline range, is sufficient without being excessive under

24   3553 for a number of reasons.

25         He has already been incarcerated 19 months,

granted, in state custody, for this conduct. None of that
time will count toward his federal sentence. It's virtually
certain that the state -- in fact, he has a trial date of
March, I think, the 4th on his state charges, the robbery,
etc., arising from the same conduct.

So no -- not -- I have no idea what's going to
happen there. Chances are he'll be convicted. So he will
get some additional time in addition to the 19 months that
he's already served. I understand different jurisdiction,
different crime, but same conduct.

He has never been incarcerated before now. He's
not -- not only -- the longest sentence that he's previously
served is a sentence that he's serving now awaiting
disposition of these charges, both federally and state.
Seven years added to what he's already facing, given what
he's done in the past, Your Honor, is in my opinion
sufficient.

There's one other factor, again, one of these
interstitial facts that I think is significant. The common
law robbery offense, it's accurate as far as it goes, but
what it doesn't report, Your Honor, is that that incident
involved at least four other, maybe -- four or five other
individuals, and the gentlemen, the victim -- and it arose
because the victim had, at least in the view of Mr. Brooks
and some of his cohorts, had been perhaps inappropriately

friendly with different girlfriends, a girl Mr. Brooks was

interested in at the time, a girl that one of the other

gentleman was interested in at the time, and this was just a

fight.  Four or five guys jumped on this one guy, beat him

up, and, oddly enough Mr. Brooks neither got the money nor

the amplifier.

But it doesn't change what occurred, that he was,

in fact, charged with that offense, that he was convicted of

that offense, that he engaged in the conduct.  It's just

that in the absence of a context, it looks like what we have

here, that is, in our case, is nothing more than a

continuation of a pattern that he started maybe a few months

early, and it's not really.  This is on an order of

magnitude that's different from anything that he had done in

his past, including the common law robbery.

All those factors taken together, I guess you can

lump that under the history and characteristics of the

defendant, from the family -- and the last thing, Judge,

I'll mention is this, because I am going to ask the Court to

recommend a Bureau of Prisons placement -- a designation of

FCI Butner.  But -- as the report indicates, his father is

at FCI Butner, and he told me just yesterday, I think it

was, that while he's not had any -- his father has not

offered to be a mentor to him, a main -- who knows what the

reasons are, until just recently when -- and Mr. Brooks told

Case 1:10-cr-00071-WO   Document 26   Filed 04/09/11   Page 18 of 38

1   me that his father has communicated with him and said, look,

2   if you can get to Butner, I'll look out for you.  You know,

3   I've got -- and if I'm no longer here, there are people here

4   who care about me who will take care of you.  It's just -- I

5   just -- the irony of that, it's just overwhelming that now

6   in -- as an incarcerated person, the father is now offering

7   mentorship.

8          Well, I think it is what it is.  But for all of

9   those reasons, Your Honor, the sentence that I contend to be

10  sufficient without being excessive is the sentence of seven

11  years for all the reasons that I just mentioned.  Thank you.

12         THE COURT:  All right.  Thank you, Mr. Dusenbury.

13  Ms. Hairston, does the Government wish to be heard?

14         MS. HAIRSTON:  Your Honor, I'll be honest.  I

15  don't quite know what to say, but I am going to say a couple

16  of things.

17         Right versus wrong.  He knows right versus wrong.

18  That's the first thing I'm going to say.  It's as simple as

19  that.  A lot of us have suffered through the loss of a

20  parent as a young child.  I'm one of those people.  Now, my

21  parents were not drug addicts, and they didn't commit

22  crimes.  But we all have a story, and we all are responsible

23  for what we choose to do with the hand we're dealt.  He was

24  dealt a bad hand, but he knows right from wrong.

25         And to argue to this Court that it's nothing

1   personal, it's just business, that I'm going to rob somebody

2   knowing full well that it's his cousin's house, and he still

3   went there.  He still went.  He cannot sit here at 21 years

4   old or 19, the age he was when this happened, and try to

5   blame that on somebody else.  He made that decision.

6          Yes, he had a bad childhood, and that's a terrible

7   thing, and I'm not saying that this Court should not

8   consider that, but not for a low end sentence, not when you

9   knowingly go into somebody's house and put a gun to

10  somebody's head, tie them up, and try to rob them just

11  because they're a drug dealer, and you put another innocent

12  person at risk.  And she apparently has a child.  What if

13  the child had been there?  Was there ever going to be a

14  point where this was going to turn out right?  No.  There

15  was never going to be a point where this was going to turn

16  out right.  So whether he thinks it's personal or not, it

17  was personal.  It was clearly personal.

18         And the other thing I'll say, Your Honor, is,

19  quite frankly, in my opinion 120 months would be the

20  sentence to impose in this case.  I know the Court's not

21  going to do that, but I just think Mr. Brooks needs to think

22  about this.  He needs to understand that he has some

23  personal responsibility here.  All aside from what he grew

24  up with as a child, he has to at some point take

25  responsibility for himself.

1    He left that crime and went on a school ground

2    with a gun, a loaded gun in his pocket with a round in the

3    chamber, around other people.  What was he going to do

4    there?  If somebody looked at him the wrong way or if

5    somebody looked at his girlfriend the wrong way there, what

6    was he going to do then?

7    Right versus wrong, Your Honor.  That's all I'm

8    saying.  He knows right versus wrong.

9    THE COURT:  I don't know that it makes a lot of

10   difference, but I'm not sure whether -- initially, when I

11   read the report, I wasn't sure but what that wasn't a school

12   function.  But now I gather rereading it that it was July 4,

13   and people had gone to Eden Morehead to watch the fireworks.

14   MS. HAIRSTON:  Yes, sir.

15   THE COURT:  Not that that -- I think it would be

16   significantly different if the firearm was on school grounds

17   while school was in session.

18   MS. HAIRSTON:  Yes, sir.

19   THE COURT:  Not that it otherwise mitigates it

20   all, but it did -- the way I finally understood it was that

21   that was just gathering at night to watch the fireworks at

22   that Eden Morehead High School.

23   MS. HAIRSTON:  And on that particular occasion,

24   Your Honor, when you've got a holiday where there are people

25   in a festive mood who may or may not be in one state of

US v. Brooks - Sentence - January 19, 2011

1   intoxication or another, it's ripe for something to happen,

2   whether he intended for it or not.  And I'm not saying he

3   went there to hurt anybody.  I'm simply saying it's another

4   instance, Your Honor, in a chain of decisions of choosing

5   between right and wrong.

6           And it's clear to me that he knows the difference

7   between right and wrong, because if he made the statement

8   about my cousin being there, and I'm not going to go through

9   with it, he knows the difference between right and wrong.

10  Don't go there to do it to begin with.  Make that choice.

11  So he has a responsibility to himself, to his family, to

12  those children that he has to learn to make the decision --

13  the right decision as opposed to the wrong decision.

14          And let me just say this about going to Butner.

15  I'd ask the Court to deny that request, because I can't see

16  any benefit coming from that; and whatever his father means

17  by saying he'll look out for him or have somebody look out

18  for him, no good's going to come from that.

19          THE COURT:  I can understand the request, but I

20  agree with Ms. Hairston on that one.  I think to make that

21  recommendation unfairly impinges on the Bureau of Prisons'

22  responsibility to make its own security risks and

23  assessments, and I can see -- I could see why Mr. Brooks

24  would want to go there, but I can also see where the Bureau

25  of Prisons might say if we start housing family members of

1    various types of criminal activity together, that presents

2    its own special risks in terms of alignments and

3    associations.  So I'm going to decline to do that.  I'll let

4    the Bureau of Prisons decide that on their own.

5            All right.  Mr. Brooks, you are not required to

6    say anything.  If you choose to remain silent, your silence

7    will not be held against you in any way whatsoever, but you

8    do have the right to address the Court before any sentence

9    is imposed; and if you wish to address the Court, now is the

10   appropriate time.

11           THE DEFENDANT:  Yes, sir.  I want to say that I

12   know -- I'm not trying to put no blame on nobody else for my

13   actions.  I know what I did was wrong, you know what I'm

14   saying.  But -- and, yeah, you know what I'm saying, I can

15   make my own decisions.  But at that time I felt like that's

16   the only thing I knew how to do, you know what I'm saying.

17   I've got kids to take care of.  Like she said, that's my

18   responsibility.  People got responsibility.  Some people

19   don't go about it the right way, the legal way.  I went by

20   what I knew.  So -- I've got to catch myself.  I'm getting

21   upset.

22           THE COURT:  You went by what you knew.  What was

23   it that you knew?

24           THE DEFENDANT:  Like all the wrong things.  I'm

25   not going to sit here and lie.  I know what I did was wrong,

US v. Brooks - Sentence - January 19, 2011

1   but I felt like -- she said I need time to think about what

2   I've done.  I feel like seven years is enough time to better

3   myself.  I'm willing to better myself.  I always have.  But

4   I messed up my school years, and I felt like I never had

5   another opportunity.  I never had nobody to take me in and

6   show me things.  My grandma kept me, but my papa can't teach

7   me how to go out and be a man --

8           THE COURT:  You have a half-brother or stepbrother

9   who is in the Air Force.  You lived with him for a while.

10          THE DEFENDANT:  You're right, Your Honor.  But

11  like I said, that was when I was in school.

12          THE COURT:  And I assume --

13          THE DEFENDANT:  I messed that life up.  That's

14  what I'm saying, I understand.

15          THE COURT:  I assumed from what I read that your

16  half-brother -- he sounded like he was a very solid

17  individual.  Maybe it was good for -- maybe it was good,

18  maybe it was bad, I don't know.  But he certainly didn't

19  sound like he would have been showing you robberies and

20  other illegal ways to make money.  And then you've got your

21  grandmother seated back there, and I suspect that your

22  grandmother wasn't teaching you illegal ways to make money

23  like robberies.

24          So where did you acquire this knowledge of

25  committing robberies to get money for your children?  Where

```
1   did that knowledge come from?
2           THE DEFENDANT:  Growing up from, you know what I'm
3   saying, living with my mother and my father.  I saw my
4   daddy -- I'm not just talking about robberies.  When I say
5   illegal things, I'm -- drugs, selling drugs.  I'm talking
6   about that, too.  That's what I saw.  That's how I saw money
7   coming in.  I never had nobody teach me how to fix cars or
8   paint houses.
9           THE COURT:  Who taught you how to commit a
10  robbery?
11          THE DEFENDANT:  I mean, nobody had to teach me
12  how.  I mean, you know what I'm saying, anybody can, you
13  know what I'm saying.  But that's not the point.  I don't
14  want to get deep into that.  I know what I did was --
15          THE COURT:  I'm responding to what you said,
16  Mr. Brooks, because you said you were doing what you knew
17  how to do; and you didn't know how to do these legal things,
18  so you chose to do the things you knew how to do.
19          THE DEFENDANT:  I was around the wrong people, the
20  wrong set of people.  You hang around the wrong people
21  that's doing the same thing that you grew up -- you know
22  what I'm saying, you grew up around, you know what I'm
23  saying, selling drugs.  Eventually, it brushes off on you,
24  and you watch them, and you eventually pick up on it, you
25  know what I'm saying.
```

```
 1          But anybody -- anybody take you out and show you
 2   how to sell a rock or sell a blunt or make some quick money.
 3   But it's not going to be just anybody that shows you how to
 4   do things.  I messed up with my own family at a young age,
 5   and I dug myself in a deep hole where I couldn't get out of
 6   it.  But, I mean, I'm learning from my mistakes right now.
 7   This is my first time being in this situation.
 8          I feel like if -- I feel like when I do go to
 9   prison, I do want to take trades and better myself so I know
10   then me knowing more I'll have a chance when I come home.
11   But at the same time I feel like my kids need my -- I've got
12   family like everybody else, and I know seven years from now
13   I'll have all kind of trades, something I didn't have before
14   I went in.
15          Even if I get 105 months, it's still -- it's
16   still -- that's just longer away from my family.  Nothing is
17   going to change.  I will still go home.  I just ask that you
18   find it in your heart to understand me.  I know my wrong.
19   I'm admitting to my wrong.  Just give me a chance to be home
20   with my family so I can do right.
21          THE COURT:  And how many years did you go to Eden
22   Morehead High School, two years?
23          THE DEFENDANT:  Yes, sir.
24          THE COURT:  And what classes did you take, do you
25   remember?
```

US v. Brooks - Sentence - January 19, 2011

1          THE DEFENDANT:  When I was in Morehead High

2     School, they never gave me a chance to take regular classes.

3     I was in behavior classes.

4          THE COURT:  All right.  Who were your teachers?

5          THE DEFENDANT:  I can't remember their names.

6          THE COURT:  Did you have one that you liked better

7     than others?

8          THE DEFENDANT:  Yeah, I did.

9          THE COURT:  Who was that?  Can you remember?  Was

10    it a man or a woman?

11         THE DEFENDANT:  It was a woman.  I can't remember

12    her name.  I can't remember her name, but she taught

13    history.  I can't remember her name.

14         THE COURT:  American history, world history?  Do

15    you remember what kind of history?

16         THE DEFENDANT:  It was U.S. history.

17         THE COURT:  And you enjoyed the class?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Did you learn a lot?

20         THE DEFENDANT:  I didn't -- at that time I

21    wasn't -- I wasn't trying to learn a lot, you know what I'm

22    saying.  When I was in history class --

23         THE COURT:  My point is this, Mr. Brooks.  Exactly

24    what you just said.  I understand your unfortunate

25    circumstances.  I didn't live through your unfortunate

US v. Brooks - Sentence - January 19, 2011

circumstances, but I can read about them, and I understand
them.  But even without a family, even without a mother and
a father, there was a teacher at Morehead who tried to teach
you something that you could have used had you been willing
to listen and do that, but you weren't ready.  So what is it
that makes you ready now?

THE DEFENDANT:  Sometimes you've got to be in
certain situations to understand.

THE COURT:  And what is that situation?

THE DEFENDANT:  Just being away from my family.
If it's seven years, I know I don't want to go through this
again, and I won't go through this again.  I just ask -- I
know when I do go to prison, I'll be able to better myself,
and that's what I'm going to do.  Whether it's 105 months,
84 months, when I get out, I am going to do right, but I ask
you --

THE COURT:  And I'm not putting you down.  I'm
just making this point.  You didn't do that when you had the
chance at Eden Morehead High School, so what is going to
make you do it now?

THE DEFENDANT:  Because I know how to quit.  My
freedom can be taken away from me from doing the things I
was doing.  When you out there in that world, you don't
think about being locked up for a long time, being away from
your family.  All you think about is your kids taking care

US v. Brooks - Sentence - January 19, 2011

```
 1    of, you helping who you live with, and that's what I did.  I
 2    know it's not right, but I learned from my mistakes.  105
 3    months --
 4            THE COURT:  A mistake.  Let me ask you this.  When
 5    you were 19 years old, if somebody had done to your kids
 6    what you did to your cousin, what would your reaction to
 7    what they had done been?
 8            THE DEFENDANT:  If somebody did it to my kids?
 9            THE COURT:  Came in the house, held your kids at
10    gunpoint, tied them up, and put them in the closet.  You
11    wouldn't be thinking of that as a mistake, would you?
12            THE DEFENDANT:  Me personally -- you probably
13    wouldn't believe me; but if that person came to talk to me
14    and gave me an understanding of how he didn't know no
15    better, I would believe him.  Why?  Because I've been
16    through the same thing.
17            THE COURT:  How he didn't know no better?
18            THE DEFENDANT:  I mean --
19            THE COURT:  How in the world could he possibly not
20    know it was wrong to do something like that?
21            THE DEFENDANT:  Your Honor, I mean, I knew it was
22    wrong, but when I say didn't know any better, I mean you
23    don't think about being taken away from your family.  You
24    just know what's going on, what you're doing is making some
25    money, and it's at that point in time.  You don't think
```

US v. Brooks - Sentence - January 19, 2011

1    about getting away from your family.  Now I'm in this

2    predicament, I'm being took away from my family.

3                THE COURT:  Because of what, Mr. Brooks?

4                THE DEFENDANT:  Because --

5                THE COURT:  Why are you being taken away?

6                THE DEFENDANT:  I did something I shouldn't have

7    did.

8                THE COURT:  Who is responsible for that?

9                THE DEFENDANT:  Me, and I -- you know what I'm

10   saying, I accept -- you know what I'm saying, I know what I

11   did, you know what I'm saying, was wrong.  But my father got

12   tooken away from me at 10.  Yeah, what he was doing was

13   wrong, but he had his own concrete business, too.  And I

14   know he wouldn't have taught me the wrong that he was doing.

15   He would have taught me how to lay concrete.  If I knew how

16   to do that, I would have laid concrete because that's what I

17   knew how to do.  If I had knew how to do it, I would have

18   done it.  If I had had somebody there to teach me how to be

19   a man, I would have been a man, but I didn't.

20                Yeah, I lived with my brother.  He was in the Air

21   Force.  He worked.  I went to school.  But at the same time,

22   it was -- that was it.  I come home, play the video game

23   after school, that was it.  He'd come home from work, he'd

24   cook, we'd watch TV, and go to sleep.  That was it.  But I

25   know my father could have taught me how to be a man.

1          I don't want to talk about them because I did what
2    I did.  It's is my fault, Your Honor.  I really would
3    appreciate it if I could get the 84 months.  I'm going to
4    better myself either way I go, 84 months or 105 months.  I
5    just hope that you understand what I'm saying.  I done said
6    mostly everything that was on my mind.  I just put it up in
7    God's hands.

8          THE COURT:  I appreciate you talking to me,
9    Mr. Brooks, and I think -- although I reach different
10   conclusions from what you reach, I think I understand more
11   about what you're saying than perhaps you would give me
12   credit for, although we might not reach the same conclusion
13   about what you're saying and what it means in terms of what
14   type of sentence should be imposed.

15          To give you an example, you were previously
16   convicted of a misdemeanor breaking and entering, a common
17   law robbery, and an affray.  I think in the affray you might
18   have gotten 30 days or something.  But no active sentences
19   imposed for those priors, pretty much?

20          THE DEFENDANT:  In the simple affray, that
21   happened while I was in jail this time.

22          THE COURT:  I'm not criticizing, I'm just pointing
23   out what your prior sentences were.  Suppose for that common
24   law robbery instead of getting a probationary sentence, you
25   had gotten a sentence of 24 months.  And I'm not saying it

1    was right or wrong for you not to get it.  Then it wouldn't
2    catch you so much by surprise to be standing here in federal
3    court facing 7 to 10.  Maybe you would have gotten the
4    message then.
5            If I go too high, I'm not being fair to you.  But
6    if I go too low, then you and others like you won't
7    understand the seriousness of the conduct that you've
8    engaged in.  Do you understand that?
9            You don't have to comment on that, I'm just
10   saying.  I listened to you, and I'm hearing what you say,
11   but I may reach different conclusions from which you think I
12   ought to reach.  Do you understand that?
13           THE DEFENDANT:  (Nodding.)
14           THE COURT:  In Mr. Brooks' case, it seems to me
15   that a sentence within the advisory guideline range is
16   sufficient but not greater than necessary.  I am not going
17   to the bottom of the guideline range.  I will impose a
18   sentence of 96 months in Mr. Brooks' case.
19           In fashioning that sentence, I do think, as
20   Ms. Hairston rightfully pointed out, that given the conduct
21   involved in this offense, there are probably some very
22   rational, reasonable reasons to go above the guidelines to
23   the 120-month maximum.  I will not do that in this case.
24           Upon consideration of the advisory guideline
25   calculation as well as all other factors set forth under

US v. Brooks - Sentence - January 19, 2011

1   18 USC Section 3553, I will note in relation to those

2   factors that in terms of the nature and circumstances of the

3   offense, Mr. Brooks' conduct in this case, and that is the

4   offense conduct in possessing the firearm during the course

5   of a robbery as well as on the grounds at Eden Morehead High

6   School after the robbery had been committed, certainly rises

7   to what the Court considers to be the more, if not the most,

8   serious level of an offense conduct underlying a 922(g)

9   conviction.

10         Looking at the history and characteristics of the

11   defendant, I do realize that the defendant has had very

12   difficult circumstances as a young person.  He's had some

13   opportunities, though, that a lot of people don't have in

14   terms of his half-brother and his grandmother and various

15   other things.  But, on the other hand, defendant was 19 at

16   the time this offense was committed, and I do find that his

17   age at the time of the offense in terms of immaturity and

18   irresponsibility was a factor that mitigates against -- in

19   some respects mitigates against the maximum sentence in this

20   case.  This is a serious offense, and the need to deter this

21   type of criminal conduct as well as others similarly

22   situated is very significant.

23         For those reasons, the Court finds that a sentence

24   of 96 months followed by three years of supervised release

25   is sufficient but not greater than necessary, and I will

```
1   impose that sentence on the terms -- with the supervised
2   release on the terms and conditions set forth in the
3   presentence report.
4           Mr. Dusenbury, anything further you want to
5   address before I impose that sentence?
6           MR. DUSENBURY:  Only in light of the Court's
7   observations regarding the BOP recommendation, I wondered if
8   the Court might consider including a recommendation that he
9   be housed at a facility other than Butner as near as
10  possible to his place of residence thinking of his family
11  having access and being able to visit him.
12          THE COURT:  I will recommend as close to his home
13  as possible, and I will recommend him to a facility where he
14  may participate in an intensive substance abuse treatment
15  program.
16          It is not lost on me, Mr. Dusenbury, and it's part
17  of the -- I think the defendant's -- I don't know if you
18  want to say immaturity.  That may be an overstatement.  But
19  one of the reasons I'm recommending Mr. Brooks to the
20  facility where he can receive intensive substance abuse
21  treatment is his acknowledged daily use of marijuana.
22          MR. DUSENBURY:  Yes, sir.
23          THE COURT:  That's not a free habit he's
24  undertaking there, and to a certain degree to hear
25  Mr. Brooks' concern over his children and his need to be
```

US v. Brooks - Sentence - January 19, 2011

there for his children is offset by the conduct that he

apparently chose to participate in while he had the

opportunity to be there with his children.  But I will

recommend him for an intensive substance abuse treatment

program.

In Case No. 1:10CR71-1, United States versus

Darius Tremayne Brooks, as to Count One, it is hereby

ordered that the defendant is committed to the custody of

the Bureau of Prisons for a term of 96 months followed by

three years of supervised release.  A special assessment of

$100 is mandatory, is hereby imposed, and is due and payable

immediately.  A fine is waived because of the defendant's

inability to pay, and restitution is not applicable in

Mr. Brooks' case.

During the period of supervised release, it is

ordered that the defendant shall comply with the standard

terms and conditions of supervised release.  In addition to

the standard terms and conditions, the following special

conditions are imposed:

One, the defendant shall provide any requested

financial information to the probation officer.

Two, the defendant shall not incur new credit

charges or open additional lines of credit without the

approval of the probation officer.

Three, the defendant shall submit to substance

abuse testing at any time as directed by the probation
officer.  The defendant shall cooperatively participate in a
substance abuse treatment program which may include drug
testing and inpatient or residential treatment and pay for
those treatment services as directed by the probation
officer.  During the course of any treatment, the defendant
shall abstain from the use of any alcoholic beverages.

Mr. Brooks, you do have the right to appeal the
sentence that I have imposed in this case.  If you choose to
appeal, notice of appeal must be filed within 14 days of the
entry of any judgment.  If you wish to appeal and cannot
afford the services of counsel, counsel will be appointed to
represent you at no additional cost to you.  Mr. Dusenbury
will be responsible for advising you with respect to your
right to appeal and filing any notice of appeal if you
should instruct him to do so.

Anything further, Mr. Dusenbury?

MR. DUSENBURY:  No, Your Honor.

THE COURT:  Ms. Hairston?

MS. HAIRSTON:  Your Honor, we would move to
dismiss Count Two pursuant to the plea agreement, and we
would ask the Court for a destruction order if a lawful
owner cannot be found.

THE COURT:  I will order the destruction of the
firearm at the conclusion of any appeals period if a lawful

US v. Brooks - Sentence - January 19, 2011

1    owner cannot be reasonably located, and I will order the

2    dismissal of Count Two pursuant to the terms of the plea

3    agreement.  Hold on one minute.

4           I will recommend to the Bureau of Prisons that the

5    defendant be designated to a facility as close to his home

6    as possible, and I will also recommend that the defendant be

7    designated to a facility where he may participate in an

8    intensive substance abuse treatment program.

9           Mr. Brooks, you are certainly free to disagree

10   with me on this, as I may very well be wrong.  But in spite

11   of your comments that you did not want to blame anyone else

12   for your predicament and were taking responsibility, I heard

13   a lot of comments that suggest a deference to deflect blame

14   for your conduct.  And until you -- at least in my mind,

15   until you hit that first point of moving forward like you

16   talked about, accepting responsibility for what you've done

17   and responsibility for those decisions, you're going to have

18   a tough time.  But some of what you said is exactly right,

19   and you can do some good things if you will follow your own

20   advice in some respects.

21          Anything further, Mr. Dusenbury?

22          MR. DUSENBURY:  No, sir.

23          THE COURT:  All right.  Good luck to you both.

24   We'll stand in recess until 2:30.

25          (At 10:43 a.m., break taken.)

US v. Brooks - Sentence - January 19, 2011

```
 1                          * * * * *

 2                      C E R T I F I C A T E

 3

 4        I, JOSEPH B. ARMSTRONG, RMR, FCRR, United States

 5   District Court Reporter for the Middle District of North

 6   Carolina, DO HEREBY CERTIFY:

 7         That the foregoing is a true and correct transcript of

 8   the proceedings had in the within-entitled action; that I

 9   reported the same in stenotype to the best of my ability;

10   and thereafter reduced same to typewriting through the use

11   of Computer-Aided Transcription.

12

13

14                                 _____
                                   Joseph B. Armstrong, RMR, FCRR
15   Date:   04/08/11              United States Court Reporter
                                   324 W. Market Street
16                                 Greensboro, NC  27401

17

18

19

20

21

22

23

24

25
```

US v. Brooks - Sentence - January 19, 2011